**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| KEITH DOUGLAS CRAIG, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 13-cv-07329 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| TYLER DRALLE, LYDIA DETHROW, | ) | |
| NELSON HOLMAN, TYRUS LAZARD, | ) | |
| MARLON MCKNIGHT, MARCUS | ) | |
| MORTON, JOHN SIEVERS, ANTHONY | ) | |
| TAYLOR, SERGION VALLE, MATTHEW | ) | |
| ZEMATIS, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Keith Douglas Craig is an inmate of the Illinois Department of Corrections who, while incarcerated at Stateville Correctional Center ("Stateville"), was attacked by his cellmate. Craig alleges that Defendants, all of whom are correctional officers at Stateville, intentionally ignored his cries for help or otherwise delayed in responding to the assault, causing him to suffer severe injuries. Craig has sued these correctional officers under 42 U.S.C. § 1983, alleging violations of his Eighth Amendment rights and a conspiracy to violate those rights. Defendants now move for summary judgment on both of Craig's claims.[1] (Dkt. No. 192.) For the following reasons, Defendants' motion for summary judgment is granted in part and denied in part.

---

[1] Although the Third Amended Complaint lists four counts, Craig subsequently filed a motion to dismiss Counts III and IV of his own complaint. (Dkt. No. 184.) Thus, only two counts remain.

## BACKGROUND

Unless otherwise noted, the following facts are undisputed.

### *The Parties*

At all times relevant to his complaint, Craig was a prisoner in the custody of the Illinois Department of Corrections. (Pl.'s Resp. to Def.'s L.R. 56.1 St. of Uncontested Facts ("PRSOF") ¶ 1, Dkt. No. 203.) While incarcerated at Stateville, Craig shared a cell with another inmate named Jeffrey Mitchell. (*Id.* ¶ 10.) On May 7, 2012, Mitchell assaulted Craig in their shared cell.

Defendants are Stateville correctional officers who were assigned to F-House during the 7:00 a.m. to 3:00 p.m. shift on May 7, 2012, when the assault occurred. (*Id.* ¶ 2.) F-House is a round building at Stateville with four stories of cells, a guard tower, and an open area in the center. (Def.'s Resp. to Pl.'s St. of Add'l Facts ("DRSOF") ¶ 1, Dkt. No. 203.) The four stories are called 1 Gallery (ground floor), 2 Gallery (second floor), 3 Gallery (third floor), and 4 Gallery (fourth floor). (*Id.* ¶ 2.) The four stories/galleries consist of prison cells circling the guard tower and an open area. (*Id.*) Craig's cell, number 222, is located on 2 Gallery. (*Id.*) From his cell, Craig could easily see the guard tower and the ground level in the center, where correctional officers often gathered when they were not otherwise preoccupied with a specific task. (*Id.* ¶¶ 4, 6.) There were no obstructions or coverings that limited the officers from seeing into his cell. (*Id.*) While in his cell, Craig could get the attention of the officer manning the tower by shouting or waving to him. (*Id.* ¶¶ 5, 32.) Inmates and correctional officers on 2 Gallery would often call and signal down to inmates and officers on 1 Gallery to get their attention. (*Id.* ¶ 6.)

During the 7:00 a.m. to 3:00 p.m. shift, Defendant Sergeant John Sievers was assigned as sergeant of F-House. (PRSOF ¶ 3.) Defendant Anthony Taylor was assigned as tower officer for the F-House Tower. (DRSOF ¶ 31.) Defendants Tyler Dralle and Matthew Zematis were assigned

as the gallery officers for 1 Gallery; Tyrus Lazard was assigned as the gallery officer for 2 Gallery; Nelson Holman and Marcus Morton were assigned as the gallery officers for 3 Gallery; and Lydia Dethrow was assigned as the gallery officer for 4 Gallery. (PRSOF ¶ 5.) Gallery officers are responsible for performing thirty-minute "rounds," safety checks during which officers go cell to cell to ensure that the inmates are safe and secure. (*Id.* ¶ 9.) Defendants Marlon McKnight and Sergion Valle were assigned as the escort officers. (*Id.* ¶ 5.) Escort officers are responsible for transporting inmates to medical appointments, the yard, and various other programs. (*Id.* ¶ 7.) Regardless of their responsibilities, Craig disputes that Defendants' respective assignments prevented them from coming to his aid during Mitchell's attack. (*Id.* ¶¶ 7–8.)

### *The Attack*

On the morning of May 7, 2012, Craig took a nap and woke up to Mitchell physically attacking him, including punching him in the face, dragging him off his bunk, and throwing him to the floor. (*Id.* ¶¶ 14–15.) Throughout the fight, Craig drifted in and out of consciousness multiple times. (*Id.* ¶ 15.) Craig also screamed for help. (DRSOF ¶ 7.) Eventually, Zematis and Valle went to Craig's cell and stopped the assault. (PRSOF ¶ 23.) Valle restrained Mitchell, while Zematis restrained Craig. (*Id.* ¶ 24.) Defendants claim that Craig was then escorted to receive medical treatment; however, other inmates of F-House would later testify that Craig was carried out of his cell and laid on the floor by the shower, and that he looked "like he was dead." (*Id.* ¶ 25.) Later that day, Dralle prepared a report stating that he "heard screams for help" and went to Craig and Mitchell's cell, where he saw Valle handcuffing Mitchell. (DRSOF ¶ 25.)

Because Craig was going in and out of consciousness during the assault, he cannot say how long it took for correctional officers to respond to the assault. In claiming that the officers deliberately delayed, Craig relies on testimony from other inmates. For example, Mitchell testified

that during the assault, Craig was "hollering for help" "pretty loud," but that it took

"approximately 15 to 20 minutes or probably maybe longer" before any correctional officers

arrived at their cell. Another inmate, Marcus Powell, was assigned to Cell 227, three or four doors

down from Craig and Mitchell's cell at the time of the assault. (PRSOF ¶ 27.) According to

Powell, it took 30 to 45 minutes for officers to respond to the fight. (DRSOF ¶ 10.) Powell

testified that from his cell, he looked into Siever's office, where he saw Dethrow sitting on

Siever's lap. (PRSOF ¶ 28.) Powell also witnessed other inmates telling Lazard, "Do you hear the

dude screaming for help, do you hear an inmate calling for help, man," to which Lazard

responded, "Fuck that cracker." (Def.'s R. 56.1 St. of Uncontested Facts ("DSUF") Ex. C at 39:3–

6, Dkt. No. 193.) Then, after Craig was taken away, Powell heard other inmates saying to

Holman, Zematis, and Sievers, "You're all standing around, you ain't doing nothing," and the

officers responded by saying to each other "in a sarcastic way," "like they were saying it in a way

where they were trying to cover each other," "did you see something, and the other one was like I

didn't hear nothing." (PRSOF ¶ 27.) Similarly, another inmate, Craig Hufford, was in Cell 223

next door to Craig and Mitchell's cell at the time of the assault. (DRSOF ¶ 20.) Hufford testified

that he saw Morton, Holman, Lazard, McKnight, Sievers, and Zematis on 1 Gallery, although he

later admitted that he did not see Holman's face and was unsure which Defendants he actually

saw on 1 Gallery. (PRSOF ¶ 29; DSUF Ex. D at 33:2–7.)

Zematis and Valle claim that they reacted as soon as they noticed Craig yelling for help,

and that it took them only 40 to 45 seconds to respond. (DRSOF ¶ 22.) Holman testified that he

heard Craig yelling for help and saw Mitchell "throwing [Craig] around," but he was busy

securing inmates and thus could not respond. (*Id.* ¶¶ 22, 29.) The remaining Defendants—

Dethrow, Lazard, McKnight, Morton, Sievers, and Taylor—all deny having any knowledge of the assault or other officers' responses to it. (*Id.* ¶ 30.)

As noted above, Craig himself has no memory of how much time passed while he was being assaulted and before officers came to his aid. But in June or July 2012, Craig talked to Brandon Bolin, another inmate, about the assault. (*Id.* at ¶ 31.) In describing the incident, Bolin said, "it just seemed like a long time before anybody came to help," and he "could hear [Craig] yelling for help . . . and then like a long time after that they finally came . . . ." (*Id.* ¶ 32.) According to Craig, at the time of this conversation with Bolin, he did not understand Bolin to mean that the correctional officers had deliberately delayed in responding to the assault. (*Id.* ¶ 37.)

### *The Grievance Process*

On July 5, 2012, Craig filed a grievance at Stateville complaining that Lieutenant Ralph Burkybile had failed to remove him from his cell with Mitchell after the attack. (PRSOF ¶ 33.) On December 5, 2012, Craig was assigned a new cellmate, Ronald Alvine. (*Id.* ¶ 34.) Alvine told Craig that he had heard Craig and other F-House inmates screaming for the correctional officers to stop Mitchell's assault on May 7, but the officers deliberately delayed in responding to the cries for help for at least 30 minutes. (*Id.*) According to Craig, after his conversation with Alvine, he began to believe that the officers "just blew me off, pretty much just . . . let it happen." (DRSOF ¶ 38.) And so on December 13, 2012, Craig sent a letter to Stateville's Internal Affairs Department asking for help identifying the officers who were working in F-House during the assault and the inmates housed in nearby cells. (*Id.* ¶ 52.) In response, Craig received a handwritten note reading, "SIR. CONTACT YOUR LAWYER FOR ALL DOCUMENTS." (*Id.*) Craig also submitted a FOIA request seeking the names of the officers, which was denied on January 14, 2013. (*Id.* ¶ 53.)

In December 2012 or January 2013, Craig filed an emergency grievance complaining about the correctional officers' failure to respond to the attack. (PRSOF ¶ 37.) The warden's office returned the grievance to Craig, notified him that it did not qualify as an emergency, and instructed him to submit it through the non-emergency grievance process. (DRSOF ¶ 40.) Craig then submitted the grievance to "counselor Hall" at Stateville in January or February 2013. (*Id.*) After submitting the grievance, Craig repeatedly followed up with Hall about the status of the grievance, including sending her handwritten notes about the grievance and requesting a copy for his records. (*Id.* ¶ 40.) However, Hall did not respond, nor did any other Stateville official. (*Id.*)

In April 2013, Craig was transferred from Stateville to Menard, a different correctional facility. (*Id.* ¶ 35.) There, Hufford and another former Stateville inmate, Robert Siverly, told Craig that during the assault, other inmates yelled and waved to the correctional officers to alert them to the attack, but the officers deliberately delayed in responding. (*Id.* ¶ 35.) Craig asked "counselor Payne" at Menard about the grievance he filed at Stateville, but she was unable to provide him with a copy of the grievance. (*Id.* ¶ 43.) On July 20, 2013, Craig submitted a FOIA request regarding the grievance, which was subsequently denied. (*Id.* ¶ 45.)

### *Craig's Attempts to Identify the Individual Defendants*

On October 11, 2013, Craig filed the instant lawsuit *pro se*, naming "John Doe" as the defendant and requesting the Court's help in obtaining the officers' names. (PRSOF ¶ 38; DRSOF ¶ 54.) The Court then directed Craig to name a supervisory official or higher-ranking officer as a nominal defendant to assist in identifying the proper defendants, and Craig filed his First Amended Complaint naming Stateville Wardens Marcus Hardy and Michael Lemke. (*Id.* ¶ 55.)

The Court subsequently granted Craig's motion for attorney representation. Beginning January 27, 2014, the Court repeatedly attempted to recruit counsel to represent Craig; however,

three times in a row, recruited counsel moved to withdraw for reasons unrelated to Craig and the case at hand, and the Court granted each request. (DRSOF ¶ 58.) Finally, the Court recruited Craig's current counsel on December 16, 2014, and on January 9, 2015, he filed an appearance. (*Id.* ¶ 60.) Over the next several months, Craig's counsel exercised diligent efforts to identify the correctional officers on duty at the time of the assault. (*Id.* ¶ 67.)

On June 12, 2015, with the assistance of counsel, Craig filed his Second Amended Complaint ("SAC"), which named Dralle, Dethrow, Holman, Lazard, McKnight, Morton, Sievers, Valle, Zematis, and "First Name Unknown Taylor." (PRSOF ¶ 39.) On July 16, 2015, in an email response to Craig's requests for Taylor's first name, Stateville's counsel identified Xavier Taylor. (PRSOF Ex. T ¶ 15.) On July 20, 2015, Craig filed a corrected SAC substituting "First Name Unknown Taylor" with Xavier Taylor. (*Id.*) As it turned out, despite the representation from Stateville's counsel, Xavier Taylor was not in fact the officer assigned to the guard tower at the time of Craig's assault. Craig's counsel learned of the mistake for the first time during the deposition of Patricia Torri[2] on May 11, 2016. Torri testified that it was not Xavier but Anthony Taylor who was assigned as the tower guard on the date of Craig's assault. (*Id.* ¶ 17.) The following day, the Court granted Craig leave to file a Third Amended Complaint ("TAC") to correctly name Anthony Taylor as a defendant but directed that the filing be delayed until after the Court ruled on certain pending motions. (*Id.*)

Defendants now move for summary judgment, arguing that Craig cannot prove his claims, that his claims are barred under the statute of limitations, and that Defendants are protected by qualified immunity.

---

[2] Craig identifies Torri as "Stateville's 30(b)(6) witness," but provides no further information as to her title or relationship to the parties or the events at issue.

**DISCUSSION**

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment will be denied if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. However, a nonmoving party "may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 248 (internal quotations omitted).

## I.    Defendants' Failure to Intervene

Section 1983 provides that a person may not be deprived of any constitutional right by an individual acting under color of state law and authorizes plaintiffs to sue persons in their individual capacities who have violated such rights. *See Lewis v. Downey*, 581 F.3d 467, 472 (7th Cir. 2009). Here, Craig claims that Defendants, acting under color of state law, subjected him to cruel and unusual punishment in violation of his Eighth Amendment rights when they deliberately delayed or failed to act despite actual knowledge that he was being beaten. "[P]rison officials have a duty to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994) (internal quotations omitted).

Although Craig describes his § 1983 claim as alleging deliberate indifference, he clearly means to bring a claim based on Defendants failure to intervene in his assault. *See, e.g.*, *Sandra T.E. v. Sperlik*, 639 F. Supp. 2d 912 (N.D. Ill. 2009) (failure to intervene claim alleging principal turned a blind eye to teacher's sexual abuse of students); *Thurman v. Vill. of Hazel Crest*, 570 F. Supp. 2d 1019 (N.D. Ill. 2008) (failure to intervene arrestee alleging village police officers

ignored another officer's use of excessive force). As bystanders, Defendants may be held liable under § 1983 if Craig can show that they "(1) had reason to know that [Craig was being assaulted], and (2) had a realistic opportunity to intervene to prevent the act from occurring." *Lewis*, 581 F.3d at 472.

### A.     Knowledge of the Assault

Craig has pointed to sufficient evidence to create a genuine issue of material fact as to whether seven of the ten Defendants had reason to know the assault was happening.

First, Craig has presented circumstantial evidence regarding Defendants' knowledge that he was under attack. Defendants were all assigned to work at Stateville's F-House at the time of the assault. (DRSOF ¶ 3.) F-House is a round building with a guard tower and an open area in the middle and prison cells around the perimeter. (*Id.* ¶ 2.) Craig and Mitchell's cell did not have any obstructions or coverings that limited the officers from seeing into it. (*Id.* ¶ 4.) From his cell on 2 Gallery, Craig could also get the attention of officers in the guard tower or on 1 Gallery by calling or signaling to them.[3] (*Id.* ¶ 5, 6.) While this evidence alone is insufficient to create a genuine issue of fact regarding all Defendants' knowledge, Craig also offers additional evidence regarding individual Defendants in form of testimony from eyewitnesses of the assault and the Defendants themselves.

Craig points to statements by Dralle, Holman, Valle, and Zematis that they heard him screaming for help. (PRSOF ¶¶ 25–29.) These admissions, along with the circumstantial evidence regarding the layout of F-House, are sufficient for a reasonable jury to conclude that these officers

---

[3] Craig contends that Powell's and Hufford's testimony places all Defendants (except Taylor) at 1 Gallery during the assault, and a reasonable jury could infer that they heard Craig screaming for help. (Pl.'s Resp. in Opp'n to Def.'s Mot. For Summ. J., Dkt. No. 202.) However, neither Powell nor Hufford testified that McKnight was on 1 Gallery during the assault. And, as further explained below, Powell testified that Dethrow was in a separate room on the first floor, and Hufford later admitted that he could not see Morton's face.

knew of the assault. Craig also has presented sufficient evidence to show a genuine dispute about whether Taylor, the officer in the guard tower, knew of the assault. First, Torri confirmed that Taylor was assigned as the tower officer during the 7:00 a.m. to 3:00 p.m. shift on May 7, 2012. (DRSOF ¶ 31.) In addition, Taylor testified that as tower officer, most of the time he stayed in the tower for the entire shift. (*Id.* ¶ 32.) Finally, Taylor admitted that inmates sometimes signaled to him from their cells by waving or shouting to him, and Defendants admitted that Craig could get the attention of the tower guard by shouting or waving. (*Id.* ¶¶ 5, 32.) Based on the above testimony, a reasonable jury could conclude that Taylor heard Craig's screams for help or saw Mitchell assaulting Craig.

In addition to the officers' own statements, Craig has testimony from inmates Powell and Hufford, who were present in F-House at the time of the assault. Powell testified that several inmates said to Lazard, "Do you hear the dude screaming for help, do you hear an inmate calling for help, man," and Lazard responded, "Fuck that cracker." (DSUF Ex. C at 39:3–6.) Powell also testified that other inmates accused Holman, Zematis, and Sievers of ignoring Craig, and that the three officers sarcastically said to one another that they had not noticed anything. (PRSOF ¶ 27.) Thus, a reasonable jury could conclude from Powell's testimony that Sievers, Lazard, Holman, and Zematis all knew Craig was being assaulted.

Powell further testified that he could see Dethrow in Sievers' office on 1 Gallery from his cell, which is only three or four doors down from Craig and Mitchell's cell. (*Id.* ¶ 28.) But unlike the other officers he identifies, Powell did not describe any conduct or statements by Dethrow that indicated she knew Craig was being assaulted, and Dethrow testified that she had no such knowledge. And whereas Lazard, the officer assigned to 2 Gallery, was allegedly standing in the hallway outside of Powell's cell—where Powell testified that he could hear Craig screaming for

help—Dethrow was in a separate room on a different floor. (DRSUF Ex. C 32:12–17.) Neither Powell nor any other witness testified that an officer inside Sievers' office should have reason to know that Craig was being assaulted. Accordingly, Craig has not created a genuine dispute of fact regarding Dethrow's knowledge of the assault.

Another inmate, Hufford, whose cell was next door to Craig and Mitchell's cell, testified that in addition to Lazard, Holman, Zematis, and Sievers, he could see Morton down on 1 Gallery during the assault. However, Hufford later backtracked from his previous statement about Zematis, saying, "No, not, no, he wasn't standing by the rails. I, only, when I saw officer— Matthew Zematis, I saw, I saw him running up the stairs at that, towards end of the assault, I saw him running up the stairs and running to stop the altercation." (DSUF Ex. D at 32:19–24.) This prompted counsel to again ask Hufford which officers he saw on 1 Gallery, and Hufford answered, "I—I, I'm not going to, I'm not going to go on—I'm not sure, because I can't get their facial recognitions from that far away . . . . I just know that there was three or four of them standing down there, I'm not going to say who they were, because I don't know." (*Id.* Ex. D at 33:2–7.) Later, Hufford admitted that he could not see Morton's face but identified him as one of the officers on 1 Gallery because "he's real tall." (PRSOF ¶ 29.) With no other evidence implicating Morton, no reasonable jury could conclude based on the testimony above that Morton knew of the assault.

In sum, Craig has not created a genuine dispute of fact regarding Dethrow, McKnight, and Morton's knowledge of the assault, but he has created a genuine dispute of fact regarding the other Defendants.

### B. Opportunity to Intervene

Turning to the second element of his claim, Craig has shown a genuine dispute of material fact as to whether the seven remaining Defendants had a realistic opportunity to intervene in the assault. This inquiry "almost always implicate[s] questions of fact for the jury." *Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir. 2005). In measuring opportunity, courts inquire whether there was sufficient time for an intervention. *Id.*; *compare Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994) (holding that police officer who stood by while another officer shoved, punched, and dragged civilian with his car for two city blocks could have intervened), *with Lewis*, 581 F.3d at 472 (holding that correctional officer present during another officer's tasing of inmate had no realistic opportunity to stop other officer from discharging taser gun). Further, the Seventh Circuit has held that a "'realistic opportunity to intervene' may exist whenever an officer could have 'called for a backup, called for help, or at least cautioned the [attacker] to stop.'" *Abdullahi*, 423 F.3d at 774 (quoting *Yang*, 37 F.3d at 285).

Craig has offered evidence that the assault lasted long enough for Defendants to intervene. Multiple witnesses—including Craig's attacker, Mitchell—testified that at least 15 minutes elapsed before Zematis and Valle intervened in the assault, with some witnesses reporting that 30 to 45 minutes passed. (DRSOF ¶¶ 10, 16, 18, 22, 24–27.). While Dralle, Valle, and Zematis argue that they responded as soon as they noticed the assault, they do not contend that the assault took place over such a short period of time that they had no opportunity to stop it. Holman admits that he noticed the assault, but he argues that he had no opportunity to respond because he was preoccupied with securing inmates. (DRSOF ¶ 29.) However, even assuming that Holman could not leave his assigned area, he has not proved that he could not have called for backup, called for

help, or cautioned Mitchell to stop. *See Abdullahi*, 423 F.3d at 774. Accordingly, a reasonable jury could conclude that the remaining Defendants had a reasonable opportunity but failed to act.

Therefore, as to Count I, the Court grants summary judgment in favor of Defendants Dethrow, McKnight, and Morton and denies summary judgment as to Defendants Dralle, Holman, Lazard, Sievers, Taylor, Valle, and Zematis.

## II.    Conspiracy

In Count II, Craig alleges a conspiracy among Defendants to violate his Eighth Amendment rights. To establish § 1983 liability based upon participation in a conspiracy, a plaintiff must demonstrate: "(1) the individuals reached an agreement to deprive him of his constitutional rights, and (2) overt acts in furtherance actually deprived him of those rights." *Beaman v. Freesmeyer*, 776 F.3d 500, 510 (7th Cir. 2015). A conspiracy may be established by circumstantial evidence, but "such evidence cannot be speculative." *Id.* at 511. "[V]ague and conclusory allegations of the existence of a conspiracy are not enough to sustain a plaintiff's burden at summary judgment." *Cooney v. Casady*, 735 F.3d 514, 519 (7th Cir. 2013) (internal quotations omitted). As discussed above, for summary judgment purposes, Craig has demonstrated a deprivation of his Eighth Amendment rights by Defendants Dralle, Holman, Lazard, Sievers, Taylor, Valle, and Zematis. For his conspiracy claim to survive, Craig must now adduce evidence of an agreement among these officers to deprive him of his rights.

Craig offers three pieces of evidence in support of his conspiracy claim. First, Craig contends that all these officers (except Taylor) were congregated on 1 Gallery, where they could hear Craig's screams, and that their 30-minute delay in responding is circumstantial evidence of an agreement not to respond. As already explained, however, the assertion that Defendants were on 1 Gallery is unsupported by the record—Hufford withdrew his testimony on this matter.

Second, Craig points to Powell's testimony regarding the "sarcastic" conversation between Holman, Sievers, and Zematis. However, even assuming the three officers informally consulted with each other and agreed after the fact to claim falsely that they did not hear Craig's screams, Craig has not offered any evidence that they agreed before or during the assault not to intervene. An agreement after the fact to cover up wrongdoing is not the same as an agreement to commit wrongdoing in the first place. *See Williams v. Seniff*, 342 F.3d 774, 785 (7th Cir. 2003) ("[O]ur case law makes clear that [t]o establish § 1983 liability through a conspiracy theory, a plaintiff must demonstrate that [] a state official and private individual(s) reached an understanding to deprive the plaintiff of his constitutional rights"); *cf.*, *Olson v. Hertz*, No. 3:11-cv-00072, 2013 WL 308961, at *4–6 (S.D. Ill. Jan. 25, 2013) (considering two separate conspiracy counts brought by plaintiff—one alleging a conspiracy to violate her civil rights through intimidation, and one alleging a conspiracy to prevent her from obtaining justice by falsifying facts in a report). Nor has Craig alleged that Holman, Sievers, and Zematis' agreement to falsely claim that they did not hear his screams violated his constitutional right of access to the courts. *Kies v. City of Aurora*, 149 F. Supp. 2d 421, 424 (N.D. Ill. 2001) ("Although the Seventh Circuit has recognized a § 1983 claim where a defendant tries to cover-up unlawful conduct, the basis for this type of claim lies in the denial of a plaintiff's right of access to the courts.").

Third, Craig points out that Zematis's, Dralle's, and Valle's post-incident reports have parallel fact sections that say nothing about any delay in responding to the assault. However, mere similarities between the officers' post hoc reports are not sufficient evidence of an illegal conspiracy. *See Seniff*, 342 F.3d at 786 (holding that similar expressions of displeasure by multiple public officials does not provide evidence of an agreement amongst the officials to deprive plaintiff of his rights); *see also Cooney*, 735 F.3d at 519 (holding that alleged

discrepancies in transcripts do not provide evidence of a conspiracy amongst attorneys and court reporter where plaintiff had no evidence that attorneys "actually communicated" with court reporter). And, as explained above, while Craig argues that the three officers "got together to agree on the story to be told to investigators," he does not claim that they came to an agreement not to intervene.

Ultimately, Craig has not presented sufficient evidence for a reasonable jury to infer that Defendants entered into an illegal conspiracy to deprive him of his Eighth Amendment rights by failing to intervene in Mitchell's assault. Therefore, the Court grants summary judgment in favor of Defendants on Craig's conspiracy claim.

### III.    Qualified Immunity

The Court next considers Defendants' affirmative defense of qualified immunity. "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (internal quotations omitted). The Supreme Court has laid out a two-step inquiry for resolving claims of qualified immunity: (1) "a court must decide whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right," and (2) "the court must decide whether the right at issue was 'clearly established' at the time of the defendant's alleged misconduct." *Id.*

As explained above, Craig has provided sufficient evidence from which a reasonable jury could conclude that Defendants violated a valid constitutional right: if Defendants deliberately delayed in responding to his cries for help, this unjustifiable failure to act would certainly violate Craig's Eighth Amendment rights. *Farmer*, 511 U.S. at 833 ("[H]aving stripped [inmates] of

virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course." (internal quotations omitted)). Additionally, a prison official's duty to protect inmates from violence and intervene in assaults was clearly established no later than the Supreme Court's decision in *Farmer*, well before the date of Craig's assault. *Id.* Therefore, the Court denies Defendants' motion for summary judgment to the extent it relies on qualified immunity.

## IV. Statute of Limitations

### A. Timeliness of Second Amended Complaint

Defendants also assert a statute of limitations defense.[4] That a claim is barred by the applicable statute of limitations is an affirmative defense, which Defendants have the burden of proving. *Law v. Medco Research, Inc.*, 113 F.3d 781, 786 (7th Cir. 1997). For purposes of claims under § 1983, federal courts look to the forum state's limitations period for personal injury actions; in Illinois, the applicable statute of limitations is two years. *Ray v. Maher*, 662 F.3d 770, 772–73 (7th Cir. 2011); 735 ILCS 5/3-202. While state tolling rules are used, the accrual of claims is governed by federal law, and § 1983 claims accrue when the plaintiff knew or should have known that his constitutional rights have been violated. *Savory v. Lyons*, 469 F.3d 667, 672 (7th Cir. 2006).

As a general rule, a claim accrues when the plaintiff discovers that "he has been ***injured*** and who ***caused*** the injury." *Barry Aviation Inc. v. Land O'Lakes Mun. Airport Comm'n*, 377

---

[4] As a preliminary matter, the Court addresses Craig's motion for leave to file a limited sur-reply opposing summary judgment. The decision whether to grant a motion or leave to file a sur-reply is within the Court's discretion. *Johnny Blastoff, Inc. v. L.A. Rams*, 188 F.3d 427, 439 (7th Cir. 1999). Here, Craig's sur-reply is a mere two pages and addresses a statute of limitations argument raised by Defendants for the first time in their reply brief. *See Univ. Healthsys. Consortium v. UnitedHealth Grp., Inc.*, 68 F. Supp. 3d 917, 922 (N.D. Ill. 2014) (acknowledging that a sur-reply might be appropriate when a moving party "sandbags" an adversary by raising new arguments in a reply brief). The Court accordingly exercises its discretion and grants Craig's motion for leave to file his sur-reply brief. The Court will consider the sur-reply in connection with the summary judgment motion.

F.3d 682, 688 (7th Cir. 2004) (emphasis in original). Here, the parties agree that Craig's claim did not accrue at the time of the assault, because Craig was going in and out of consciousness and did not know how long it took for the officers to respond. (DRSOF ¶ 8.) Thus, Craig could not have known during or immediately after the assault that Defendants had violated his constitutional rights.

Defendants, however, argue that Craig should have known of his constitutional injury after his conversation with Bolin in June or July 2012, when Bolin said that it "seemed like a long time before anybody came to help." However, Craig's understanding that Defendants did not respond immediately does not mean that, at that time, he should have realized that Defendants ***deliberately delayed*** in responding and thus violated his Eighth Amendment rights. *See, e.g.*, *Miles v. Trempealeau Cty.*, 204 Fed. App'x. 570, 572 (7th Cir. 2006) (finding that statute of limitations began running when plaintiff "knew or should have known that the burglary would remain uninvestigated");[5] *Turner v. City of Chi.*, No. 06 C 4786, 2007 WL 707546, at *2 (N.D. Ill. March 5, 2007) ("Plaintiff alleges that the promotions occurred in September 2004, but . . . it is possible that, despite her best efforts, plaintiff did not discover that the promotions were ***unlawful*** until much later." (emphasis added)). Instead, Craig first knew or should have known of his claims against Defendants after his conversation with Alvine on December 5, 2012, when Alvine told him the officers deliberately delayed in responding to Craig's cries for help. (DRSOF ¶ 34.) Thus, the accrual date for statute of limitations purposes is December 5, 2012.

Although Craig initiated this lawsuit on October 11, 2013 (within the two-year period), he did not file his SAC listing Defendants by name until June 12, 2015. Because the applicable statute of limitations is two years, and more than two years passed between December 5, 2012

---

[5] *Miles* is an unpublished Seventh Circuit order issued after January 1, 2007. Although not precedential, the order's reasoning is persuasive and provides a useful point of comparison here. *See* Fed. R. App. P. 32.1(a); 7th Cir. R. 32.1(b).

(Craig's conversation with Alvine) and June 12, 2015, Craig's complaint would not appear to be timely. Nonetheless, "[e]quitable tolling of the statute of limitations permits a plaintiff to sue after the statute of limitations has expired if through no fault or lack of diligence on his part he was unable to sue before." *Savory*, 469 F.3d at 673 (internal quotations omitted). An essential element of equitable tolling is that "the plaintiff have exercised due diligence"; in other words, that "he acted reasonably." *Shropshear v. Corp. Counsel of City of Chi.*, 275 F.3d 593, 595 (7th Cir. 2001).

Drawing all inferences in favor of Craig as the nonmoving party, the Court accepts Craig's assertion in his sur-reply that he did not know Defendants' names until after his recruited counsel conducted discovery. It is undisputed that during the assault, Mitchell repeatedly knocked him unconscious, making it particularly difficult for Craig to identify Defendants. (DRSOF ¶ 8.) The Seventh Circuit has instructed district courts to give "more latitude and assistance" to *pro se* prisoners seeking to discover their defendants' names. *See Bryant v. City of Chi.*, 746 F.3d 239, 244 (7th Cir. 2014) (applying equitable tolling because "an incarcerated pro se plaintiff is limited in what he can do to obtain missing information"); *Savory*, 469 F.3d at 673 (holding that equitable tolling is appropriate "if plaintiff is unable to determine who caused his injury"). Prior to initiating this lawsuit, Craig wrote a letter to the Stateville Internal Affairs Department requesting the names of all officers on duty in F-House at the time of the incident, submitted a FOIA request, and filed an emergency grievance. Despite his persistent efforts, he was unable to obtain the information he needed to identify Defendants. Thus, the Court observes that Craig acted with due diligence, supporting his claim for equitable tolling.[6]

---

[6] Defendants do not dispute that Craig's recruited counsel also acted with due diligence in "attempt[ing] to ascertain Defendants' identities." (DRSOF ¶ 62.)

Equitable tolling is also appropriate while the recruitment of counsel is pending. *Savory*, 469 F.3d at 673. Starting on January 27, 2014, the Court attempted to recruit counsel for Craig. Due to a series of requests by counsel to withdraw, the Court could not find willing and able counsel for Craig until December 16, 2014, and Craig's recruited counsel subsequently entered his appearance on January 9, 2015.

Ultimately, the totality of the circumstances illustrates that Craig exercised due diligence and that the statute of limitations expired despite his diligence. The Court thus applies equitable tolling to the time between January 27, 2014 and January 9, 2015 (the time between the Court's first attempt to recruit counsel for Craig and the date when Craig's recruited counsel ultimately entered his appearance), rendering Craig's complaint timely.

### B.     Timeliness of Third Amended Complaint

Even if Craig's complaint was timely as to other Defendants, Taylor contends that the statute of limitations bars Craig's claims against him because Craig did not name him until he filed the TAC on October 13, 2016.

The Court first rejects any contention that the TAC relates back to the SAC under Federal Rule of Civil Procedure 15(c). The relation-back doctrine applies in circumstances where the defendant who is sought to be added knew or should have known that, absent a mistake, he would have been sued. *See Krupski v. Costa Crociere S.p.A.*, 560 U.S. 538, 522 (2010); *see also Joseph v. Elan Motorsports Tech. Racing Corp.*, 638 F.3d 555, 559–60 (7th Cir. 2011). Even where the correct defendant's and mistaken defendant's names are very similar, Rule 15(c) does not permit relation back if the correct defendant had no reason to know of the action. *See, e.g.*, *Wilson v. Howell*, No. 00 C 5205, 2002 WL 31572583, at *3 (N.D. Ill. Nov. 19, 2002) (holding that amended complaint did not relate back where plaintiff mistakenly named Gregory Howell, Jr.

instead of Gregory Howell, Sr. because Sr. had no reason to know of the mistake). Here, Craig offers no evidence that Anthony Taylor knew or should have known that Xavier Taylor had been mistakenly named in his stead. Therefore, Craig's only remaining argument against the statute of limitations as it applies to Anthony Taylor is equitable tolling.

Equitable tolling is appropriate where the plaintiff has shown that "a reasonable person in [his] position could not have learned that he had a claim against [defendant] earlier than he learned." *Bontkowski v. Smith*, 305 F.3d 757, 762 (7th Cir. 2002). Craig explains that initially, the SAC filed on June 12, 2015 listed "First Name Unknown" Taylor as a defendant. On July 16, 2015, Stateville's counsel incorrectly stated in an email to Craig's counsel that Taylor's first name was Xavier. (PRSOF Ex. T ¶ 15.) This prompted Craig to file a corrected SAC on July 20, 2015, naming Xavier Taylor. However, on May 11, 2016, the deposition of Stateville's Rule 30(b)(6) witness revealed that Anthony Taylor was the tower guard on duty during the assault. (*Id.* ¶ 17.) Accordingly, the Court granted Craig leave to file his TAC naming Anthony Taylor as a defendant, although the Court asked Craig to delay until after the Court ruled on certain pending motions. Based on the above, the Court finds that a reasonable person would have relied on Stateville's counsel's misrepresentation and misidentified Taylor; as such, equitable tolling is appropriate.[7] The application of equitable tolling to the time between June 16, 2015 (when Stateville's counsel incorrectly identified the tower guard as Xavier Taylor) and May 11, 2016 (the date of Patricia Torri's deposition) and the time between May 17, 2016 (when Craig's counsel requested leave to file the TAC) and October 12, 2016 (when the Court granted leave to file the TAC) renders Craig's complaint against Anthony Taylor timely.

---

[7] Again, Defendants do not dispute that Craig's recruited counsel "diligently attempted to ascertain Defendants' identities." (DRSOF ¶ 62.)

Finally, the Court does not agree that Defendants will be "prejudiced because they are being asked to defend against stale claims." As previously explained, the statute of limitations is an affirmative defense that Defendants have the burden to prove. The purpose of the statute of limitations is to "protect defendants from being sued after the evidence on which their defense would depend has disappeared." *Cesal v. Moats*, 851 F.3d 714, 726 (7th Cir. 2017). Defendants have failed to identify any faded evidence or explain in any way how they will be prejudiced if Craig's claims go forward. Even though several of the defendants claim that they have no knowledge of Craig's assault, they do not blame this lack of knowledge on the passage of time. Therefore, the Court denies Defendants' motion for summary judgment to the extent that it is based on the statute of limitations.

## V.     Exhaustion of Administrative Remedies

As a third affirmative defense, Defendants assert that Craig failed to exhaust his administrative remedies. The exhaustion of administrative remedies is a precondition to a federal prisoner filing a § 1983 suit. *Dale v. Lappin*, 376 F.3d 652, 655 (7th Cir. 2004); *see also* 42 U.S.C. § 1997(e)(a). "In order to properly exhaust, a prisoner must submit inmate complaints and appeals in the place, and at the time, the prison's administrative rules require." *Dale*, 376 F.3d at 655. However, "failure to exhaust is an affirmative defense that the defendants have the burden of pleading and proving." *Id.*

In support of this affirmative defense, Defendants merely contend in their brief that there is no documentary evidence that Craig refiled his grievances relating to this incident after his first attempt failed.[8] Defendants do not offer any evidence—not even an affidavit from a prison official

---

[8] Craig claims that after speaking to Alvine on December 5, 2012, he filed two emergency grievances with the Stateville warden's office, asserting that the correctional officers on duty on May 7, 2012 "clearly heard myself and other inmates screaming for help to stop the attack on me by Inmate Mitchell but these

21

knowledgeable of the grievance process or a records custodian who could testify as to whether there is any record of Craig's grievance. The only evidence before the Court on this matter is a signed affidavit submitted by Craig, swearing that he refiled the grievance. (*Id.* Ex. J.). To be clear, merely refiling his grievance would not likely have exhausted Craig's administrative remedies and the Court is ***not*** holding here that Craig has proved that he exhausted his remedies. *See Hernandez v. Dart*, 814 F.3d 836, 842 (7th Cir. 2016) (holding that prisoner at Cook County Department of Corrections must file a grievance ***and*** appeal after receipt of any administrative response to the grievance to exhaust his administrative remedies); *Dixon v. Page*, 291 F.3d 485, 489 (7th Cir. 2002) (setting forth the Illinois Department of Corrections' "three-step grievance procedure" that prisoners must follow in order to exhaust their administrative remedies). However, for purposes of summary judgment, Defendants have not met their burden of showing there is no dispute of material fact that Craig failed to exhaust his remedies. *Dale*, 376 F.3d at 656; *see, e.g.*, *Twitty v. McCoskey*, 226 Fed. App'x. 594 (7th Cir. 2007)[9] ("The defendants offered evidence of a formal, written grievance procedure used by the jail and corroborated [the inmate's] failure to file a formal grievance under those procedures. Moreover, they offered testimony that the jail never received any other written communication from [the inmate] or anyone else addressing his medical needs."). Therefore, the Court denies Defendants' motion for summary judgment based on Craig's failure to exhaust his administrative remedies.

---

guards intentionally delayed responding to the assault for between 30 minutes and an hour." (PRSOF Ex. J ¶¶ 15–16.) Craig admits these grievances were rejected for improper procedure.

[9] *Twitty* is another unpublished Seventh Circuit order issued after January 1, 2007 that, although not precedential, contains persuasive reasoning and provides a useful point of comparison. *See* Fed. R. App. P. 32.1(a); 7th Cir. R. 32.1(b).

**CONCLUSION**

For the foregoing reasons, Craig's motion for leave to file a limited sur-reply (Dkt. No. 213) is granted. Furthermore, Defendants' motion for summary judgment (Dkt. No. 192) is granted in part and denied in part. With respect to Count I, the motion is granted as to Dethrow, McKnight, and Morton, and denied as to Dralle, Holman, Lazard, Sievers, Taylor, Valle, and Zematis. With respect to Count II, the motion is granted as to all Defendants.

ENTERED:

Dated: September 30, 2018

_____
Andrea R. Wood
United States District Judge